

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- x
BETTINA M. WHYTE,                        :
as Trustee of the SemGroup Litigation    :
Trust,                                   :
                                         :
                         Plaintiff,      :     12 Civ. 5318(JSR)
                                         :
                                         :     OPINION AND ORDER
                  -v-                    :
                                         :
BARCLAYS BANK PLC, and BARCLAYS CAPITAL, :
INC.,                                    :
                                         :
                         Defendants.     :
---------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff Bettina M. Whyte, acting in her capacity as the trustee of the SemGroup Litigation Trust (the "Trustee"), brings the above-captioned case seeking to avoid certain transactions between several SemGroup entities[1] and defendants Barclays Bank PLC and Barclays Capital, Inc. (collectively, "Barclays"). On August 22, 2012, the defendants moved this Court to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. In response to the Rule 12(b)(1) prong of the motion, the Court permitted

---

[1] The SemGroup entities include: SemCrude, L.P., Chemical Petroleum Exchange, Incorporated, Eaglwing, L.P., Grayson Pipeline, L.L.C., Greyhawk Gas Storage Company, L.L.C., K.C. Asphalt L.L.C., SemCanada II, L.P., SemCanada L.P., SemCrude Pipeline, L.L.C., SemFuel Transport LLC, SemFuel, L.P., SemGas Gathering LLC, SemGas Storage, L.L.C., SemGas, L.P., SemGroup Asia, L.L.C., SemGroup Finance Corp., SemGroup, L.P., SemKan, L.L.C., SemManagement, L.L.C., SemMaterials Vietnam, L.L.C., SemMaterials, L.P., SemOperating G.P., L.L.C., SemStream, L.P., SemTrucking, L.P., Steuben Development Company, L.L.C., SemCap, L.L.C., SemGroup Holdings, L.P. (collectively, "SemGroup").

1

the plaintiff to amend her complaint, in the process of which she cured any jurisdictional defect by adequately pleading diversity of citizenship. Following that amendment, Barclays conceded that the Court possessed jurisdiction and renewed its motion to dismiss the amended complaint under Rule 12(b)(6) for failure to state a claim. See Supp. Mem. of Law in Supp. Of Defs.' Mot. to Dismiss at 5. On November 7, 2012, after full consideration of the parties' briefs and oral arguments, the Court, by "bottom-line" Order, granted the defendants' motion to dismiss. This Memorandum Order explains that ruling and directs the entry of final judgment.

For the purposes of a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the Complaint and draws all reasonable inferences in favor of the plaintiff. Litwin v. Blackstone Group, L.P., 634 F.3d 706, 715 (2d Cir. 2011). According to the amended complaint, SemGroup was a large energy transport and storage company that filed for bankruptcy on July 22, 2008. Prior thereto, on June 15, 2008, Barclays and SemGroup entered into an agreement (the "novation"), by which, in return for approximately $143 million, Barclays acquired SemGroup's portfolio of commodities derivatives traded on the New York Mercantile Exchange ("NYMEX"). That portfolio has since become profitable. See Am. Compl. ¶¶ 45-46, 65, 87.

On October 28, 2009, the United States Bankruptcy Court for the District of Delaware confirmed a plan (the "Plan") pursuant to Chapter 11 of the Bankruptcy Code, by which there was established a SemGroup

Litigation Trust (the "Trust") empowered to liquidate certain of SemGroup's assets and to prosecute certain claims relating to the SemGroup bankruptcy. Spefically, by the terms of the agreement creating the Trust, certain creditors (so-called "contributing lenders") and the relevant debtors and debtors' estates putatively assigned "any and all" of their claims to the Trust.[2] The Trust was in turn empowered to bring any claim or cause of action transferred to it, including avoidance actions arising under Chapter 5 of the Bankruptcy Code and state law causes of action otherwise available to the debtors who transferred their claims to the Trust. See Am. Compl. ¶ 15; Fourth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code of the bankruptcy estates of SemGroup, Decl. of Joshua Fritsch ("Fritsch Decl."), Ex. A, at §§ 1.7, 1.83, 11.1-11.6.[3] See also

---

[2] Section 1.34 of the Plan defines contributing lenders' claims, in pertinent part, as "any and all Causes of Action by the Contributing Lenders . . . against (i) SemGroup Energy Partners . . . and its subsidiaries, (ii) any debtor, (iii) all current and former officers, directors, or employees of any Debtor or non-Debtor affiliate, (iv) all affiliates of persons described in clause (iii) . . . and (v) all Entities that provided services to or conducted transactions with any Debtor or non-Debtor affiliate, including, without limitation, all attorneys, accountants, financial advisors, trading counterparties, and customers or vendors, in each case solely as provider of services or goods to any Debtor or non-Debtor affiliate; provided, however, that the BNPP Claim will be excluded . . . ." See Fritsch Decl. Ex. A, at 4. The parties dispute whether the clause "in each case solely as the provider of services or goods to any Debtor or non-Debtor affiliate" should limit the assignment of claims to exclude the Barclays novation. Because the Court grants the defendant's motion on other grounds, it need not reach this issue.

[3] In deciding a Rule 12(b)(6) motion, a court may consider those documents incorporated in the complaint by reference or necessity, as well as

In re Appleseed's Intermediate Holdings, LLC, 470 B.R. 289 (D. Del. 2012) (applying the 546(e) safe harbor for settlement payments to a fraudulent conveyance action brought by a litigation trustee pursuant to section 544 and applicable state laws); In re DBSI, Inc., 477 B.R. 504 (Bankr. D. Del. 2012) (same).

In this action, the Trustee seeks to avoid the novation of SemGroup's NYMEX portfolio on the ground that the transaction with Barclays was a fraudulent conveyance, not under the Bankruptcy Code, but as defined by various provisions of New York's Debtor-Creditor Law ("NYDCL").

At the outset, it is important to note that the Trustee is not seeking to avoid the novation under section 544 (or any other section) of the Bankruptcy Code. Of course, the two-year post-filing period for seeking to avoid a transaction under other sections of the Code has long since passed; but section 544, might, in the ordinary case, empower the Trustee to assert a state-law fraudulent conveyance action, which, in the case of New York state law, would extend the statute of limitations to six years. But section 544 is subject to several limitations, of which the one relevant here is the provision of section 546(g), which deprives a bankruptcy trustee of the power to bring avoidance actions otherwise given to her by the Code where she seeks to avoid "a transfer, made by or to (or for the benefit of) a swap participant or financial participant,

---

matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

4

under or in connection with any swap agreement and that is made before the commencement of the case."[4] The Code's definition of swap agreements is "extremely broad, covering several dozen enumerated contracts and transactions, as well as combinations of them, options on them, and similar contracts or transactions." In re Nat'l Gas Distribs., LLC, 556 F.3d 247, 253 (4th Cir. 2009). Barclays contends, and the Trustee does not dispute, that the novation qualifies as a "swap" transaction benefiting from the safe harbor of section 546(g).

Accordingly, the Trustee seeks to here invoke, not her powers under the Bankruptcy Code, but her rights under state law as "holder and assignee of all claims and causes of action against Barclays." Am. Compl. at 2.[5] The Trustee's argument begins with the uncontroversial assertion that despite the legal fiction of section 544, avoidance claims remain property of creditors during bankruptcy. Since, the Trustee argues, section 546(g) applies only to "an estate representative who is exercising federal avoidance powers under [section 544 of] the

---

[4] The Court notes that there is an exception to 546(g)'s safe harbor for actions to avoid transfers that the debtor made with "actual intent to hinder, delay, or defraud any entity to which the debtor was . . . indebted." See 11 U.S.C. § 548(a)(1)(A). Although paragraph 95 of the amended complaint talismanically recites the "hinder, delay, or defraud" language, it alleges no facts to support this conclusory allegation, and the Trustee has not pursued the matter further.

[5] Plaintiff withdrew her claim for unjust enrichment in her opposition papers to the instant motion, see Pl.'s Mem. at 4 n. 1, so only the state law fraudulent conveyance actions remain. Although the parties dispute whether the SemGroup creditors in fact assigned the rights necessary for the plaintiff to assert her state-law causes of action, the Court need not reach that issue given its disposition below.

Bankruptcy Code," section 546(g) should not apply to "claims asserted by creditors" after the bankruptcy concludes without a release of such claims. Pl.'s Mem. of L. in Opp. to Def.'s Motion to Dismiss ("Pl.'s Mem.") at 19-20. Since the Plan caused the assignment of the relevant creditors' claims to Whyte as the trustee of the SemGroup litigation trust, Whyte argues that she need not assert these claims as the trustee of a bankruptcy estate and section 546(g) is thus irrelevant.

The trouble with this clever argument is that it would, in effect, render section 546(g) a nullity. But such an absurd result is here avoided, because under well-established principles of federal preemption, section 546(g) impliedly preempts the Trustee's attempt to resuscitate fraudulent avoidance claims as the assignee of certain creditors where, as here, she would be expressly prohibited by section 546(g) from asserting those claims as assignee of the debtor-in-possession's rights (or, indeed, as the functional equivalent of a bankruptcy trustee).

Implicit preemption takes two forms: "(1) field preemption, where Congress has manifested an intent to 'occupy the field' in a certain area . . .; and (2) conflict preemption, where state law 'actually conflicts with federal law.'" Id. Barclays's asserts the latter theory of implied preemption, under which it must show either that (i) "compliance with both federal and state regulations is a physical impossibility," (ii) that "state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," or (iii)

that "federal law is in 'irreconcilable conflict' with state law." <u>Mary Jo C. v. N.Y. State and Local Retirement Sys.</u>, 707 F.3d 144, 162 (2d Cir. 2013).[6]

Although both the second and third tests may well be met here, the Court finds it necessary only to discuss the second, for permitting a trustee that is the creature of a Chapter 11 plan to avoid a "swap transaction" by way of a state fraudulent conveyance action would stand as a major obstacle to the purposes and objectives of Congress in passing, and then expanding, the 546(g) "safe harbor."

The obvious purpose of section 546(g), fully confirmed by the legislative history, is to protect securities markets from the disruptive effects that unwinding such transactions would inevitably create. Beginning in 1982, Congress, "concerned about the volatile nature of the commodities and securities markets," amended the Bankruptcy Code by adding section 546(e) so as to protect margin and settlement payments against avoidance actions in order "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." <u>Kaiser Steel Corp. v. Charles Schwab & Co., Inc.</u>, 913 F.2d 846, 849 (10th Cir. 1990). In 1990, Congress further amended section 546 by adding subsection (g), so as "to ensure that the swap and forward contract financial markets

---

[6] Because there is a history of significant federal presence in this area of regulation, the Court does not apply a presumption against preemption. See <u>United States v. Locke</u>, 529 U.S. 89, 108 (2000). Even if the Court were to apply such a presumption, however, doing so would not alter the result the Court reaches below.

are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code" and to minimize volatility in swap markets. See Act of June 25, 1990, H.R. Rep. 101-484, at 3, available at 1990 WL 92539 (1990). And in 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109-8, 119 Stat. 23 (2005), further amended the Bankruptcy Code to make even more complete the protection of participants in swap transactions and swap agreements by introducing an "extremely broad" definition of swap agreements in order to "protect[] *all* counterparties to these agreements." In re Nat'l Gas Distribs, 556 F.3d at 253 (emphasis in original). Both the facial breadth of these provisions, and the corresponding legislative history, make plain that Congress intended to place swap transactions totally beyond the inherently destabilizing effects of a bankruptcy and its attendant litigation.

    The patent purpose and intended effects of section 546(g) would be totally undercut if, at the same time that a trustee in bankruptcy was prohibited from avoiding swap transactions, a Chapter 11 "litigation trustee" could hold swap-related avoidance actions in abeyance for eventual litigation as the mere assignee of creditors' claims. Here, permitting the litigation trust -- which is, by operation of the Chapter 11 Plan and contracts made pursuant to it, the assignee of both the creditors' rights and the debtors' rights to bring fraudulent avoidance actions -- to order its litigation to delay swap-avoidance actions until it might stand solely in the shoes of the creditors would not only run

8

contrary to the expectations of the Bankruptcy Court in approving the Plan but also would make a mockery of Congress's purpose of minimizing volatility in the swap markets.

Indeed, the very facts of this case well illustrate the dangers that Congress sought to avoid. Whyte's Complaint contends that SemGroup's NYMEX portfolio eventually embraced 20% of the nation's crude oil inventory. See Am. Compl. ¶ 4. Yet, on Whyte's interpretation of the statute, there need only be a two-year hiatus before the Trustee, wearing her non-bankruptcy hat, can bring actions that would totally imperil the stability of this large corpus of swap positions. If anything, such a strategy only increases the risk of uncertain, unpredictable, and therefore destabilizing market volatility. See, analogously, Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V., 651 F.3d 329, 338-39 (2d Cir. 2011) (applying 546(e) to "long-settled" leveraged buyout payments after observing that "[w]e see no reason to think that undoing Enron's redemption payments, which involved over a billion dollars and approximately two hundred noteholders, would not also have a substantial and similarly negative effect on the financial markets.").

Moreover, on the Trustee's view, section 546(g) could be thwarted in any bankruptcy by the simple devise of conveying fraudulent conveyance claims into a litigation trust for later use, repackaged as creditors' state law fraudulent conveyance claims. This approach has already been, in effect, rejected in roughly analogous cases involving section 546(e).

9

See Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 988 (8th Cir. 2009); In re Hechinger Inv. Co. of Del., Inc., 274 B.R. 71, 96 (D. Del. 2002) ("Claims that Congress deemed unavoidable under sections 544(b) and 546(e) . . . cannot be avoided by simply re-labeling avoidance claims as [state law] unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless."). The argument gains no greater currency here.

In sum, the Court, confirming its "bottom-line" Order, holds that where, as here, creditors' claims are assigned along with Chapter 5 federal avoidance claims to a litigation trust organized pursuant to a Chapter 11 plan, the section 546(g) "safe harbor" impliedly preempts state-law fraudulent conveyance actions seeking to avoid "swap transactions" as defined by the Code. Accordingly, the Clerk of the Court is hereby directed to enter final judgment dismissing the amended complaint, with prejudice.

SO ORDERED.

Dated:   New York, NY
         June 11, 2013

JED S. RAKOFF, U.S.D.J.